# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

United States of America,

                                             Case No. 14-cr-373 (ADM/TNL)

                        Plaintiff,

v.

                                                    **REPORT AND**
                                                  **RECOMMENDATION**

Thurlee Belfrey (1),
Roylee Belfrey (2),
Lanore Belfrey, a/k/a Lanore
VanBuren, (3),

                        Defendants.

---

Robert M. Lewis and David M. Maria, Assistant United States Attorneys, United States Attorney's Office, 316 North Robert Street, Suite 404, St. Paul, MN 55101 (for the Government);

Deborah K. Ellis, Ellis Law Office, 101 East Fifth Street, Suite 2626, St. Paul, MN 55101 (for Defendant Thurlee Belfrey);

Kevin W. DeVore, Larson King LLP, 30 East Seventh Street, Suite 2800, St. Paul, MN 55101 (for Defendant Roylee Belfrey); and

Glenn P. Bruder, Mitchell, Bruder & Johnson, 7505 Metro Boulevard, Suite 325, Edina, MN 55439 (for Defendant Lanore Belfrey).

---

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on the following motions: Defendant Thurlee Belfrey's Motion to Dismiss Count 1, (ECF No. 166); Defendant Roylee Belfrey's Motion to Dismiss Count 1, (ECF No. 181); Defendant Lanore Belfrey's Motion to Suppress Statements, Admissions and Answers, (ECF No. 173); Defendant Lanore Belfrey's Motion to Dismiss Counts 1 and 2 of the Fourth Superseding Indictment Pursuant to Fed. R. Crim. P. 12(b)(3)(B)(iii) and (v),

(ECF No. 178); and Defendant Lanore Belfrey's Motion for Severance, (ECF No. 180). These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable Ann D. Montgomery, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

A hearing was held on April 6, 2017, and continued and completed on April 14, 2017. (ECF Nos. 193, 194). With respect to the motions addressed herein, the Court heard testimony from Internal Revenue Service ("IRS") Supervisory Special Agent Valerie Ingram, IRS Special Agent Kelly Petricka, Defendant Lanore Belfrey, and IRS Special Agent Jeremy Martin. The Court received into evidence: Government Exhibit 1 (photograph) and Government Exhibit 3 (target letter).

Post-hearing briefing is complete and the motions are ripe for determination by the Court. Based upon all the files, records, and proceedings herein, along with the testimony and evidence presented, the undersigned recommends that: Lanore's[1] motion for severance be denied; Thurlee and Roylee's motion to dismiss count 1 be denied; Lanore's motion to dismiss counts 1 and 2 be denied; and Lanore's motion to suppress be denied.

## I.    LANORE'S MOTION FOR SEVERANCE

Lanore seeks to sever her case from trial from that of her co-defendants pursuant to Federal Rule of Criminal Procedure 14.

---

[1] Because all defendants share a last name, the Court refers to the defendants herein by their first names for clarity.

"When a defendant moves for a severance, a district court must first determine whether joinder is proper under Federal Rule of Criminal Procedure 8. If joinder is proper, the court still has discretion to order a severance under Federal Rule of Criminal Procedure 14." *United States v. Darden*, 70 F.3d 1507, 1526 (8th Cir. 1995). These rules "are liberally construed in favor of joinder." *United States v. Rimell*, 21 F.3d 281, 288 (8th Cir. 1994); *Darden*, 70 F.3d at 1526. The propriety of joinder "must appear on the face of the indictment." *United States v. Bledsoe*, 674  F.2d 647, 655 (8th Cir. 1982) (citations omitted).

Rule 8 of the Federal Rule of Criminal Procedure allows for the joinder of offenses and defendants in criminal cases. Under Rule 8(a), offenses may be joined if they "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Under Rule 8(b), defendants may be joined if "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). The defendants "may be charged in one or more counts together or separately" and "need not be charged in each count." Fed. R. Crim. P. 8(b); *United States v. Delpit*, 94 F.3d 1134, 1143 (8th Cir. 1996) ("Importantly, not every defendant joined must have participated in every offense charged.") (citation omitted).

In general, "persons charged in the same offense should be tried together, especially when proof against them is based upon the same evidence or acts." *United States v. Voss*, 787 F.2d 393, 401 (8th Cir. 1986); *United States v. Beasley*, 102 F.3d

1440, 1448 (8th Cir. 1996) ("Where codefendants are charged with the same crimes, including conspiracy, and the crimes of the codefendants will be proved by the same evidence, joint trials are generally favored.") (citation omitted). "Trying codefendants together not only conserves scarce time and resources, but also 'gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome.'" *United States v. Hively*, 437 F.3d 752, 765 (8th Cir. 2006) (quoting *Darden*, 70 F.3d at 1528).

Here, Lanore is charged in two counts of a 43-count indictment. In Count 1, Lanore is charged with conspiracy to defraud the United States in violation of 18 U.S.C. § 286. (Fourth Superseding Indictment, ECF No. 159). The conspiracy, ranging "[f]rom in or about 2001 and lasting until at least on or about March 20, 2014" involved Lanore, her husband Thurlee, and her brother-in-law Roylee defrauding the United States by "obtaining the payment and allowance of false, fictitious, and fraudulent claims, on behalf of themselves and others by submitting claims and accepting payment for the provision of health care service funded by programs administered by the United States Department of Health and Human Services." (Fourth Superseding Indictment, at 4–5). As alleged, Thurlee, Roylee and others "operated businesses to obtain reimbursement from healthcare programs funded by the United States," and allowed Thurlee to participate in these businesses "knowing that such businesses were not permitted to obtain reimbursement if [Thurlee] participated in the businesses." (Fourth Superseding Indictment, at 5). Thurlee, Roylee, and Lanore "agreed and cooperated to conceal" Thurlee's role in these companies, including Model Healthcare, by having the companies

be owned by Lanore. (Fourth Superseding Indictment, at 5). Thurlee, Roylee, and Lanore submitted "false and fraudulent claims for the provision of health care services" and diverted proceeds of the fraud "for the personal use and benefit" of Thurlee, Roylee, and Lanore, resulting in gains of "millions of dollars." (Fourth Superseding Indictment, at 6).

In Count 2, Lanore is charged with conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347, 1349. The conspiracy, ranging "[f]rom in or about 2001 and lasting until at least on or about March 20, 2014" involved Lanore, Thurlee, and Roylee conspiring with each other and others to defraud a health care benefit program to obtain money and property via "false and fraudulent pretenses, representations, and promises" in connection with the delivery of and payment for health care benefits, items, and services. (Fourth Superseding Indictment, at 6). Related to the conspiracy, the Government alleges Roylee and Thurlee concealed receipt of income to themselves and others to avoid taxation through a number of methods, including creating multiple businesses, opening multiple bank accounts, and receiving income in cash, payments to their spouses, payments from corporate accounts for personal expenses, and payment from payroll accounts for personal expenses. (Fourth Superseding Indictment, at 7). Thurlee and Roylee allegedly used the services of an accountant to conceal income and avoid payment of taxes for themselves and their spouses, including Lanore. (Fourth Superseding Indictment, at 7). Lanore is alleged to have signed various IRS Form 941 filings that were false as well as to have concealed Thurlee's role in Model Healthcare. (Fourth Superseding Indictment, at 8). Thurlee and Roylee filed personal and corporation income tax returns that falsely characterized deductions and underreported income and

tax liability for them and their spouses, including Lanore. (Fourth Superseding Indictment, at 8).

With respect to the counts of the Fourth Superseding Indictment in which Lanore is not charged, they cover acts allegedly committed by Thurlee and Roylee that relate to the conspiracies charged in Counts 1 and 2. Count 3 charges Thurlee and Roylee with conspiracy to defraud the United States by engaging in acts to avoid paying taxes. (Fourth Superseding Indictment, at 9). The Government then details 17 overt acts in furtherance of this conspiracy involving transfers or payments of money, filings of tax forms, and withholding of payroll taxes. (Fourth Superseding Indictment, at 9–11). Counts 4 through 43 essentially stem from the actions described in Counts 1 through 3. Counts 4 through 29 charge Thurlee and Roylee with failure to account truthfully for and pay over withheld taxes in violation of 26 U.S.C. § 7202, with the Government detailing the business entity owing federal income and FICA taxes that were withheld from employee wages, as well as the quarter and date on which those taxes were due. (Fourth Superseding Indictment, at 12–13). As to Counts 30 through 36, the Government alleges Thurlee and Roylee committee concealment of money laundering, in violation of 18 U.S.C. § 1956(a)(1). These charges allege Thurlee and Roylee conducted financial transactions affecting interstate and foreign commerce which involved the proceeds of unlawful activity, knowing the transaction was designed to conceal and disguise where the money came from. (Fourth Superseding Indictment, at 14). The Government lists seven specific transactions that include the date, the amount, the transaction type (check paid or deposit made), the originating account number and financial institution, and the

receiver of the funds. (Fourth Superseding Indictment, at 14). As to Counts 37 through 42, Thurlee and Roylee are charged with engaging in monetary transactions in criminally-derived property in violation of 18 U.S.C. § 1957. These charges allege Thurlee and Roylee engaged in monetary transactions in criminally-derived property of value greater than $10,000, in transactions affecting interstate and foreign commerce, and involving proceeds of unlawful activity. (Fourth Superseding Indictment, at 15). The Government lists six specific transactions that include the date, the amount, the transaction type (check paid), the originating account number and financial institution, and the receiver of the funds. (Fourth Superseding Indictment, at 14). And for Count 43, Thurlee and Roylee are charged with conspiring to commit money laundering in violation of 18 U.S.C. §§ 1956–57. This count alleges Thurlee and Roylee conspired with each other and other persons to conduct financial transactions involving the proceeds of unlawful activity designed to conceal where the money came from. (Fourth Superseding Indictment, at 16). It also alleges that Thurlee and Roylee conspired with each other and other persons to engage in monetary transactions through a financial institution involving proceeds of unlawful activity. (Fourth Superseding Indictment, at 16).

In sum, the Government alleges Lanore participated in a conspiracy with Thurlee and Roylee to conceal Thurlee's involvement in a healthcare business that accepted federal money. This participation involved acting as the owner of one of the several businesses used to obfuscate Thurlee's participation and submitting false tax documentation. As a reward for the illicit activity, the Government alleges Lanore, Thurlee, and Roylee siphoned money that should have been paid as taxes, legitimate

healthcare needs, or otherwise. While Lanore is only charged in two of the 43 counts, those remaining counts relate to overt acts allegedly committed by Thurlee and Roylee related to the underlying conspiracy alleged by the Government. Evidentiary proof against the defendants will likely be the same because the Government will need to prove the links of the conspiracy between Thurlee, Roylee, and Lanore, particularly where the Government alleges there are multiple business entities and financial institutions involved in order to obfuscate the parties' actions, as well as acts stemming from the conspiracy. Thus, joinder of offenses and defendants was proper under Rule 8 given the common scheme and acts alleged.

Although Rule 8 permits joinder, "a trial court may order separate trials on different counts, or sever certain defendants' cases from others', to protect defendants' fair-trial rights." *Delpit*, 94 F.3d at 1143 (citing Fed. R. Crim. P. 14(a); *Darden*, 70 F.3d at 1527). Where multiple defendants have been charged in the same indictment, "there is a preference for a joint trial unless the benefits are outweighed by a clear likelihood of prejudice." *Hively*, 437 F.3d at 765 (citing *Zafiro v. United States*, 506 U.S. 534, 537 (1993)); *United States v. Cooper*, 2006 WL 2095217, at *2 (N.D. Iowa 2006) ("There is a presumption against severing properly joined cases, and such presumption is a 'strong' one.") (citing *Delpit*, 94 F.3d at 1143). The party seeking severance has the burden of showing a clear likelihood of prejudice. *United States v. Frazier*, 280 F.3d 835, 844 (8th Cir. 2002). Moreover, "[s]everance is never warranted simply because the evidence against one defendant is more damaging than against another." *Hively*, 437 F.3d at 765.

This remains true even if severance might increase the likelihood that a defendant will be acquitted. *Id.*; *United States v. Anthony*, 565 F.2d 533, 538 (8th Cir. 1977).

Lanore asserts that failure to sever her trial from that of her co-defendants presents several prejudicial concerns: the jury will have "insurmountable difficulty distinguishing the alleged acts of each defendant from the alleged acts of his or her co-defendants," that evidence may be introduced that is not admissible as to all defendants, that the jury will have insurmountable difficulty distinguishing evidence on one count from evidence presented on other counts such that the jury will "inevitably consider the evidence cumulatively," and that she would receive a fairer and more impartial trial if she is tried separately from her co-defendants.

"Prejudice can be demonstrated by showing that the jury will be unable to compartmentalize the evidence as it relates to the separate defendants because of a 'prejudicial spillover effect.'" *Hively*, 437 F.3d at 765 (quoting *Mickelson*, 378 F.3d at 817). Where there is only some risk of prejudice by joinder, proper jury instructions can cure the risk of prejudice. *Zafiro*, 506 U.S. at 540; *Mickelson*, 378 F.3d at 818 ("The risk of prejudice posed by joint trials is best cured by careful and thorough jury instructions."); *see also United States v. Pherigo*, 327 F.3d 690, 693 (8th Cir. 2003) ("In our consideration of the jury's ability to compartmentalize the evidence against the joint defendants, we consider 1) the complexity of the case; 2) if one or more of the defendants were acquitted; and 3) the adequacy of admonitions and instructions by the trial judge."). Here, Lanore does not argue that a limiting instruction would not alleviate prejudice. As noted above, evidentiary proof against the defendants will likely be the same because the

Government will need to prove the links of the conspiracy between Thurlee, Roylee, and Lanore. This Court finds that adequate jury instructions and admonitions by the trial judge would be sufficient in this case to assist the jury's ability to compartmentalize the evidence and prevent prejudice.

In contrast, the benefits of a joint trial in this case are compelling. All defendants are charged in a single, familial conspiracy. The overlapping evidence will give the jury the best perspective, increasing the likelihood of a correct outcome. A joint trial will also conserve scarce judicial time and resources. Lanore has not demonstrated a clear likelihood of prejudice.

The Court finds that joinder of defendants and offenses is proper. The benefits of a joint trial are compelling. Defendants are charged in a long-running conspiracy to defraud United States health care benefit programs. The illicit gains made via this family-controlled conspiracy were then funneled to defendants in various manners, such as financial transactions and tax evasion. As indicated above, the overlapping and intertwined nature of the evidence will give the jury the best perspective, increasing the likelihood of a correct outcome. A joint trial will also conserve scarce judicial time and resources. Lanore has not demonstrated a clear likelihood of prejudice. Therefore, this Court recommends that Lanore's motion to sever be denied without prejudice.

## II.    MOTIONS TO DISMISS

### A.  Count 1 – Thurlee, Roylee, and Lanore

Thurlee, Roylee, and Lanore move to dismiss Count 1 on the grounds that the Government lacks evidence of false, fictitious, or fraudulent claims against a department

or agency of the United States. Thurlee, Roylee, and Lanore argue that the Government's theory is that the defendants defrauded the United States by concealing Thurlee's participation in healthcare entities. Thurlee, Roylee, and Lanore argue that this is not a cognizable conspiracy charge under 18 U.S.C. § 286. The Government opposes, arguing that Thurlee and Roylee have merely re-packaged their previously-denied motions for bills of particulars.

In Count 1, Thurlee, Roylee, and Lanore are charged with conspiracy to defraud the United States in violation of 18 U.S.C. § 286. (Fourth Superseding Indictment). The conspiracy, ranging "[f]rom in or about 2001 and lasting until at least on or about March 20, 2014" involved Lanore, Thurlee, and Roylee "knowingly" defrauding the United States by "obtaining the payment and allowance of false, fictitious, and fraudulent claims, on behalf of themselves and others by submitting claims and accepting payment for the provision of health care service funded by programs administered by the United States Department of Health and Human Services." (Fourth Superseding Indictment, at 4–5). As alleged, Thurlee, Roylee and others "operated businesses to obtain reimbursement from healthcare programs funded by the United States," and allowed Thurlee to participate in these businesses "knowing that such businesses were not permitted to obtain reimbursement if [Thurlee] participated in the businesses." (Fourth Superseding Indictment, at 5). Thurlee, Roylee, and Lanore "agreed and cooperated to conceal" Thurlee's role in these companies, including Model Healthcare, by having the companies be owned by Lanore. (Fourth Superseding Indictment, at 5). Thurlee, Roylee, and Lanore submitted "false and fraudulent claims for the provision of health care services" and

diverted proceeds of the fraud "for the personal use and benefit" of Thurlee, Roylee, and Lanore, resulting in gains of "millions of dollars." (Fourth Superseding Indictment, at 6).

Under Rule 7(c)(1), an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government." Counts in an indictment "may allege that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means." Fed. R. Crim. P. 7(c)(1). And "[f]or each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." *Id.*

> An indictment adequately states an offense if: it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution. An indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant was convicted.

*United States v. Hayes*, 574 F.3d 460, 472 (8th Cir. 2009) (quoting *United States v. Sewell*, 513 F.3d 820, 821 (8th Cir. 2008)). "An indictment is normally sufficient if its language tracks the statutory language." *Sewell*, 513 F.3d at 821 (citing *Hamling v. United States*, 418 U.S. 87, 117 (1974)).

Under 18 U.S.C. § 286: "[w]hoever enters into any agreement, combination, or conspiracy to defraud the United States, or any department or agency thereof, by obtaining or aiding to obtain the payment or allowance of any false, fictitious or fraudulent claim, shall be fined . . . or imprisoned not more than ten years, or both."

Count 1 of the Fourth Superseding Indictment, charging a violation of 18 U.S.C. § 286, meets the requirements of Rule 7(c)(1) and adequately states an offense. Count 1 details a (1) conspiracy between Thurlee, Roylee, Lanore, and possibly others, (2) to defraud the United States Department of Health and Human Services (3) by obtaining or aiding to obtain the payment or allowance of false, fictitious, or fraudulent claims. While Thurlee and Roylee assert that the claims are merely the concealment of Thurlee's participation in the healthcare businesses, the Fourth Superseding Indictment alleges Thurlee, Roylee, and Lanore submitted "false and fraudulent claims for the provision of health care services . . . ." (Fourth Superseding Indictment, at 6).

Indeed, as the Government argues, Thurlee, Roylee, and Lanore's motions mirror Thurlee and Roylee's previously-denied motions for bills of particulars. In their motions, Thurlee and Roylee sought specificity regarding: "[t]he means and manner in which [they] allegedly violated the exclusion provision under 42 U.S.C. § 1302a-7(i)(3)" and "[s]pecific identification of which law makes it [a] crime for Thurlee . . . to have *any* involvement with a health care business after the 2004 DHHS letter." (ECF Nos. 107, 108) (emphasis in original). The Court found the indictment—which corresponding count is substantially similar now as it was then—"sufficient to advise the defendants of the charges, prevent surprise or prejudice at trial, and to protect each defendant from double jeopardy." (ECF Nos. 114, 115, *objections overruled by* ECF No. 129). The Court sees no reason to conclude differently here; Count 1 of the Fourth Superseding Indictment is adequate.

Finally, "[i]t has long been settled that an indictment is not open to challenge on the ground that there was inadequate or insufficient evidence before the grand jury." *United States v. Nelson*, 165 F.3d 1180, 1182 (8th Cir. 1999) (citing *Costello v. United States*, 350 U.S. 359, 363–64 (1956), and *United States v. Cady*, 567 F.2d 771, 776 (8th Cir. 1977)). To the extent Thurlee, Roylee, and Lanore believe the Government will not be able to prove Count 1, this argument is better left to the trial judge, such as in a Rule 29 motion for judgment of acquittal. *See* Fed. R. Crim. P. 29(a) ("After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."). Therefore, the Court recommends denying Thurlee, Roylee, and Lanore's motion to dismiss Count 1.

### B. Count 2 – Lanore

Lanore moves to dismiss Count 2 on similar grounds as her motion to dismiss Count 1, essentially that the Government lacks evidence that Lanore was aware of Thurlee's exclusion from federal healthcare programs and that the Government lacks evidence of actual fraud in providing healthcare services.

In Count 2, Lanore—alongside Thurlee and Roylee—is charged with conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347, 1349. The conspiracy, ranging "[f]rom in or about 2001 and lasting until at least on or about March 20, 2014" involved Lanore, Thurlee, and Roylee "knowingly" conspiring with each other, and others, to defraud a health care benefit program to obtain money and property via "false and fraudulent pretenses, representations, and promises" in connection with the delivery

14

of and payment for health care benefits, items, and services. (Fourth Superseding Indictment, at 6). Related to the conspiracy, the Government alleges Roylee and Thurlee concealed receipt of income to themselves and others to avoid taxation through a number of methods, including creating multiple businesses, opening multiple bank accounts, and receiving income in cash, payments to their spouses, payments from corporate accounts for personal expenses, and payment from payroll accounts for personal expenses. (Fourth Superseding Indictment, at 7). Thurlee and Roylee allegedly used the services of an accountant to conceal income and avoid payment of taxes for themselves and their spouses, including Lanore. (Fourth Superseding Indictment, at 7). Lanore is alleged to have signed various IRS Form 941 filings that were false as well as to have concealed Thurlee's role in Model Healthcare. (Fourth Superseding Indictment, at 8). Thurlee and Roylee filed personal and corporation income tax returns that falsely characterized deductions and underreported income and tax liability for them and their spouses, including Lanore. (Fourth Superseding Indictment, at 8).

As discussed above, under Rule 7(c)(1), an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government." Counts in an indictment "may allege that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means." Fed. R. Crim. P. 7(c)(1). And "[f]or each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." *Id.*

> An indictment adequately states an offense if: it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution. An indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant was convicted.

*Hayes*, 574 F.3d at 472 (quoting *Sewell*, 513 F.3d at 821). "An indictment is normally sufficient if its language tracks the statutory language." *Sewell*, 513 F.3d at 821 (citing *Hamling*, 418 U.S. at 117).

> Under 18 U.S.C. § 1347:

> Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice
> > (1) to defraud any health care benefit program; or
> > (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined . . . or imprisoned not more than 10 years, or both.
> . . .
> (b) With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section.

And under 18 U.S.C. § 1349, "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

Count 2 of the Fourth Superseding Indictment, charging violations of 18 U.S.C. §§ 1347, 1349, meets the requirements of Rule 7(c)(1) and adequately states an offense. Count 2 details a (1) a scheme or artifice between Thurlee, Roylee, Lanore, and possibly

others, (2) to defraud a health care benefit program (3) in connection with the delivery of healthcare benefits, items, or services, in this case. While Lanore asserts that the Government has not alleged the proper scienter—knowingly and willfully—the Fourth Superseding Indictment alleges Lanore knowingly participated in the conspiracy. This participation included serving as the owner of Model Healthcare and signing fraudulent IRS Form 941 filings that were used to conceal Thurlee's role in the healthcare business and siphoning ill-gotten money for gain. Moreover, as discussed above, Lanore's second ground for relief mirrors Thurlee and Roylee's previously-denied motions for bills of particulars regarding arguments that Thurlee never violated a law because it was not illegal for him to have *any* involvement in a healthcare business after his exclusion letter. The argument remains unpersuasive as applied to Count 2.

"It has long been settled that an indictment is not open to challenge on the ground that there was inadequate or insufficient evidence before the grand jury." *Nelson*, 165 F.3d at 1182 (citing *Costello*, 350 U.S. at 363–64, and *Cady*, 567 F.2d at 776). To the extent Lanore believes the Government will not be able to prove Count 2, this argument is better left to the trial judge, such as in a Rule 29 motion for judgment of acquittal. *See* Fed. R. Crim. P. 29(a). Therefore, the Court recommends denying Lanore's motion to dismiss Count 2.

## III.    LANORE'S MOTION FOR SUPPRESSION

### A. Findings of Fact

Valerie Ingram is a Supervisory Special Agent with IRS Criminal Investigation. (Transcript of April 6 and 14, 2017 Pretrial Motions Hearings, at 16:15–17:7, ECF Nos.

198 and 201). Ingram has been with IRS Criminal Investigation for about 12 years. (Tr. 16:15–17:7). Kelly Petricka is an IRS Special Agent. (Tr. 64:4–9). Jeremy Martin is an IRS Special Agent employed with the Criminal Investigation Division. (Tr. 165:11–18).

On March 20, 2014, Ingram, Petricka, an Edina police officer, approximately 10 federal law enforcement agents, and one IRS professional staff member executed a search warrant at the Edina, Minnesota residence of Lanore and her husband Thurlee. (Tr. 17:8–18:20, 41:11–14, 42:12–43:1, 75:16–25, 116:6–19, 137:4–12). At the same time a search warrant was being executed at the Edina residence, law enforcement were conducting searches at four other locations. (Tr. 18:10–13). Prior to executing the search warrant, the Edina residence had been under surveillance. (Tr. 41:15–42:11, 75:10–12). Ingram and Petricka were assigned to interview Lanore. (Tr. 64:6–15).

The search started at approximately 8:00 a.m. (Tr. 18:21–22, 116:20–117:12). Law enforcement knew Thurlee had left the residence by the time the search began. (Tr. 18:23–19:5, 41:25–42:11, 75:13–15). The Edina police officer parked in the Edina residence's driveway and the other law enforcement parked on the street. (Tr. 43:2–12, 76:1–17). Law enforcement exited their vehicles and proceeded to the front door as a group. (Tr. 19:6–14, 43:10–15). Law enforcement knocked on the door and it "opened." (Tr. 19:6–14, 43:16–44:22, 116:20–118:5, 128:19–129:4). Ingram testified her weapon was drawn when she went up to the door. (Tr. 21:9–25). Ingram was wearing a bulletproof vest that identified her as law enforcement with the IRS. (Tr. 25:21–26:1). Petricka was dressed similarly. (Tr. 68:21–69:7). The other members of law enforcement

18

were also wearing clothing that identified them as law enforcement. (Tr. 44:4–9, 116:20–118:5).

Law enforcement then entered the home and observed Lanore coming from the kitchen area. (Tr. 19:6–14, 44:23–45:6, 67:1–4, 117:13–24). Ingram approached Lanore, who asked what was happening, with Ingram responding that law enforcement was executing a search warrant and securing the residence. (Tr. 19:6–14. 20:20–23, 22:11–25, 47:6–25, 78:3–79:7, 118:6–22, 129:5–7). Lanore appeared surprised. (Tr. 85:10–25). Ingram asked if anyone else was in the house, with Lanore indicating there was no one else present. (Tr. 118:25–119:12). Ingram testified that while her weapon was drawn when she went up to the door, she would have holstered her weapon at the time she confirmed Lanore had no weapons on her person; but her hand was likely on her gun as she entered the residence. (Tr. 21:9–25, 45:7–47:5; *see* Tr. 138:23–139:9). Petricka testified her weapon was drawn when she approached the door, but holstered it upon approaching Lanore. (Tr. 69:8–15, 77:9–78:2; *see* Tr. 138:23–139:9).

Ingram and Petricka stood with Lanore to ensure she remained in one location while law enforcement finished entering and securing the residence. (Tr. 19:15–20:6, 49:4–14, 64:16–66:22, 119:13–120:4). Ingram did not physically touch Lanore, did not handcuff her, or use any physical restraints on her. (Tr. 20:7–16, 119:13–120:4). Lanore was dressed in a bath robe. (Tr. 20:17–19, 48:14–18, 120:5–6). Ingram informed Lanore she could leave the residence but that if she left she could not return until the search was completed, and that she could stay but she would be escorted throughout the house while

the search was being conducted. (Tr. 22:11–25, 51:18–52:2, 57:14–58:11, 62:1–7, 64:16–66:22, 67:22–68:1, 78:3–79:7, 81:12–22, 82:24–83:19).

Ingram then asked Lanore if she would be willing to speak with her and Petricka. (Tr. 25:11–18, 119:13–120:8). Lanore agreed. (Tr. 25:11–18, 142:1–144:3; *see* Tr. 57:3–13). Ingram suggested to Lanore that she get dressed given she was wearing only a bath robe. (Tr. 23:1–10, 49:20–25, 68:9–20, 120:7–12). Ingram and Petricka escorted Lanore upstairs to change clothes. (Tr. 23:1–25, 49:10–50:3, 68:2–8, 81:23–82:23, 120:13–121:10). Once Ingram, Petricka, and Lanore arrived at the bedroom, Ingram and Petricka looked around to make sure there were no weapons or people inside. (Tr. 50:4–14, 81:23–82:23, 120:13–121:10). Ingram and Petricka stayed in the room while Lanore dressed. (Tr. 50:15–19, 81:23–82:23, 120:13–121:10). Lanore never objected to or complained of Ingram or Petricka's presence while accompanying her throughout her residence, but Lanore did ask if Ingram and Petricka were going to watch her change clothes, with Ingram responding in the affirmative. (Tr. 24:1–5, 68:9–20, 120:13–121:10, 140:20–141:1, 155:16–25). Ingram and Petricka did not explore alternative options, such as going through the clothes Lanore wished to wear and allowing her to dress privately in the bathroom. (Tr. 154:19–25). Lanore testified that she felt violated and traumatized. (Tr. 121:9–10).

Ingram and Petricka escorted Lanore to a three-seasons porch. (Tr. 121:11–13). Before beginning the interview, Ingram returned to her vehicle to remove her bulletproof vest and retrieve some documents she needed for the interview. (Tr. 26:2–16, 67:5–21). Ingram was then dressed in business casual attire, with a coat jacket covering her

holstered firearm. (Tr. 26:2–16, 51:6–16, 58:17–59:3). Petricka stayed with Lanore while Ingram went to her vehicle. (Tr. 26:16–23, 67:5–21).

Once Ingram returned, Ingram and Petricka began interviewing Lanore in a three-season porch at the rear of the residence. (Tr. 26:24–27:12, 50:20–51:5, 84:18–85:5, 121:14–17). The three-season porch has a sliding glass door that opens to a deck, which was covered with snow at the time. (Tr. 27:13–29:25, 79:12–23, 123:6–16; Gov't Ex. 1). Lanore sat on a couch, with Petricka to her left on the same couch. (Tr. 27:13–29:25, 69:22–70:20; Gov't Ex. 1). Ingram was sitting next to the sliding glass door on an ottoman, across from Petricka and Lanore. (Tr. 27:13–29:25; Gov't Ex. 1). Between the couch and ottoman was a glass table. (Gov't Ex. 1). Partially obstructing the sliding glass door was a decorative vase on the floor. (Gov't Ex. 1). Petricka's firearm was holstered on her left side, putting it on the opposite side of Lanore while the two were seated on the couch. (Tr. 32:23–33:20, 69:22–70:20). Ingram and Petricka were between Lanore and the three-seasons porch's interior doorway. (Tr. 123:17–22, 125:14–22).

The interview began at approximately 8:13 a.m. (Tr. 30:12–18). The interview lasted about three hours. (Tr. 33:21–24, 34:25–35:2, 126:25–127:2). Ingram and Petricka asked questions and received answers from Lanore, who appeared willing to answer the questions asked. (Tr. 35:15–20). Lanore never expressed to Ingram or Petricka that she wished to conclude the interview. (Tr. 36:8–18, 142:24–144:3). At no point during the interview did Lanore state that she was currently represented by a lawyer or that she wished to speak to a lawyer. (Tr. 35:21–36:25, 56:10–14, 72:16–73:10, 131:13–24, 162:9–163:). During the interview, however, Lanore did discuss having had an attorney

in 2009 named Bruce Crawford concerning IRS civil matters. (Tr. 60:7–61:18, 86:12–21, 131:13–24, 133:17–135:23, 151:12–152:6, 162:9–163:2, 163:21–164:23). Martin testified that the last payment to Crawford from an entity related to Lanore was in 2009, and that Crawford received a payment in 2010 from a business entity unrelated to Lanore. (Tr. (Tr. 166:5–167:12).

During the interview, Ingram did not physically touch Lanore, did not handcuff her, or use any physical restraints on her. (Tr. 20:7–16, 139:10–20). Ingram and Petricka never removed their firearms from their holsters after the initial entry into the residence. (Tr. 21:17–22:10, 69:11–23). Lanore never mentioned to Ingram or Petricka anything about their firearms. (Tr. 33:14–20, 71:1–11). Throughout the interview, Lanore did not express any fear, anxiety, or concern to Ingram about being interviewed. (Tr. 35:5–14). The tenor of the interview was casual. (Tr. 72:11–15, 85:6–86:11, 141:2–25). Lanore was not provided a *Miranda* warning, but was familiar with her *Mirana* rights. (Tr. 86:22–24, 57:3–5, 121:21–25, 127:25–128:4, 130:1–131:1). No other law enforcement entered the three-seasons porch while Lanore was being interviewed. (Tr. 88:12–89:2).

At the conclusion of the interview, Lanore was not arrested. (Tr. 36:1–7, 73:11–16). At the end of the interview, Ingram provided Lanore a "target letter" from Assistant United States Attorney Robert Lewis dated March 19, 2014, that indicated Lanore "ha[s] been designated as a target of a federal criminal investigation which involves alleged tax crimes, health care fraud, and conspiracy, among other potential offenses." (Tr. 38:2–39:8, 53:11–54:2, 59:21–60:6, 62:8–20, 148:14–149:3; Gov't Ex. 3). The fourth paragraph states as follows: "If you retain counsel, please have your attorney call [AUSA

Lewis] to discuss the matter. If you cannot afford an attorney, you may call the Office of the Federal Public Defender . . . to discuss publicly appointed representation." (Gov't Ex. 3; Tr. 39:9–20). The letter lists the telephone number of the prosecutor and the Federal Defender's Office. (Gov't Ex. 3). The letter continues: "If I do not hear from you or counsel representing you by April 15, 2014, we will assume that you are not interested in a pre-Indictment resolution." (Gov't Ex. 3). Lanore read the letter. (Tr. 39:21–40:1, 149:4–11). Sometime in the summer of 2014, Lanore's current attorney, Glenn Bruder, contacted AUSA Lewis indicating he was going to be appointed to represent Lanore. (Tr. 40:2–25, 149:8–150:6).

At around 8:25 a.m. on the date the warrant was being executed, Thurlee returned to the Edina residence. (Tr. 30:19–31:1, 33:25–34:12, 54:3–6, 72:23–25, 84:5–17, 124:21–125:6). Thurlee entered through the garage, past the three-season porch, into the kitchen. (Tr. 31:2–18, 89:10–92:4; *see* Tr. 87:18–88:7). Ingram escorted Lanore to the kitchen to speak briefly with Thurlee; Ingram was also in the kitchen. (Tr. 31:12–32:10, 54:7–55:2, 72:1–7, 84:5–17). Lanore testified that she was told she could not speak with Thurlee until her interview was completed. (Tr. 124:21–125:6, 127:6–24). Nonetheless, Lanore spoke to Thurlee, and afterwards Ingram and Lanore returned to the three-season porch to continue the interview. (Tr. 32:11–22, 72:1–7). Thurlee agreed to be interviewed by two different special agents elsewhere in the residence. (Tr. 34:13–24). Thurlee's interview lasted a little longer than Lanore's. (Tr. 34:22–24).

At some point during the interview, Lanore asked to use the bathroom. (Tr. 24:6–25:10, 55:3–11, 123:23–124:2). Ingram escorted Lanore to the bathroom and went into

the bathroom to check for weapons or evidence. (Tr. 24:6–25:10, 55:12–19, 124:3–6). After the check was completed, Lanore was permitted to use the bathroom alone, with Ingram waiting outside. (Tr. 24:6–25:10, 55:17–23, 124:3–11). At some point during the interview, Lanore received and drank water. (Tr. 30:1–11, 71:12–21, 124:14–20; Gov't Ex. 1). Lanore was permitted to walk to the kitchen to retrieve the water bottles, escorted by either Ingram or Petricka. (Tr. 71:18–72:1, 83:20–84:4, 124:14–20).

Lanore testified that before she changed clothes, she asked Ingram and Petricka why law enforcement was in the residence and if she needed an attorney. (Tr. 122:2–25, 131:6–135:23). Lanore testified that Ingram asked Lanore why she needed an attorney if she was not guilty and that AUSA Lewis would look upon her case favorably if she spoke to law enforcement without an attorney. (Tr. 122:2–25). Lanore testified that she responded that she was not guilty and had nothing to hide, and that she felt it was better for her to speak to law enforcement without an attorney. (Tr. 122:2–25). Ingram testified in rebuttal that this conversation never happened. (Tr. 160:14–161:18). Ingram also testified that if Lanore had requested an attorney, she would have ended the interview and documented it in her memorandum. (Tr. 160:14–161:18).

Lanore testified that she was not *asked* if she wanted to speak with law enforcement, but that she was *told* she would be speaking with law enforcement. (Tr. 128:5–10). Lanore later testified on cross-examination that she told Ingram and Petricka she would answer questions. (Tr. 142:1–23). Lanore testified that she felt she had to ask permission from Ingram and Petricka to do anything. (Tr. 125:14–22). Lanore did not ask to leave the house, but testified that she did not know she could ask to leave.

24

(Tr. 146:16–147:23). Lanore testified she did not feel free to leave. (Tr. 125:23–126:6, 156:11–157:9). Lanore also testified that she did not want to leave the residence. (Tr. 153:9–154:4).

### B. Conclusions of Law

Under the Fifth Amendment, *Miranda* warnings are "required when interrogation is 'initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). To determine whether a defendant was "in custody" for *Miranda* purposes, courts first "consider the 'totality of the circumstances' confronting the defendant at the time of the interview, and then . . . determine 'whether a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest.'" *United States v. Muhlenbruch*, 634 F.3d 987, 995–96 (8th Cir. 2011) (quoting *United States v. Flores-Sandoval*, 474 F.3d 1142, 1146 (8th Cir. 2007); *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The court focuses on "objective circumstances, not on subjective views of the participants." *Muhlenbruch*, 634 F.3d at 996 (quoting *Flores-Sandoval*, 474 F.3d at 1146).

Courts have used the following non-exhaustive factors to inform the custody inquiry:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with

> authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). The first three factors are "mitigating factors" that "tend to mitigate the existence of custody at the time of the questioning," while the last three factors are "coercive factors" that "tend to aggravate the existence of custody." *Id*. "A finding of custody does not require the factual circumstances of a case to present all indicia; and a particularly strong showing of one factor may compensate for a lesser or non-existent showing of another factor." *United States v. Axsom*, 289 F.3d 496, 501 (8th Cir. 2002).

"There is no requirement . . . that the *Griffin* analysis be followed ritualistically in every *Miranda* case." *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004). But "[w]hen the factors are invoked, it is important to recall that they are not by any means exclusive, and that 'custody' cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *Id.* "The ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." *Id.* at 828.

Here, in looking at the totality of the circumstances as guided by the *Griffin* factors, the Court concludes Lanore was not in custody. The first *Griffin* factor, which is a mitigating factor, is present. Ingram informed Lanore she could leave the residence, but could not return until the search was completed. Ingram told Lanore that she could also choose to remain at the residence, but that she would be supervised for officer safety

while the search was ongoing. The Eighth Circuit has "long regarded these admonitions as weighty in the custody analysis" and has "never held that a person was in custody after receiving them." *Perrin*, 659 F.3d at 721; *Czichray*, 378 F.3d at 826 ("That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview. So powerful, indeed, that no governing precedent of the Supreme Court or this court, or any case from another court of appeals that can be located (save one decision of the Ninth Circuit decided under an outmoded standard of review), holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning.") (internal citation omitted). After being told these admonitions, Ingram asked Lanore if she would be willing to speak with law enforcement, and Lanore agreed. Before beginning any questioning, Lanore was permitted an opportunity to change out of her bath robe.

Lanore's testimony that she was not asked, but told, she would speak with law enforcement is not credible. Indeed, Lanore testified both that she agreed to speak with Ingram and Petricka, but also that she was forced to speak with Ingram and Petricka. Such internal inconsistency detracts from Lanore's credibility. Lanore's testimony that she did not know she could leave the residence is also unconvincing. Lanore agreed to speak with Ingram and Petricka, going so far as testifying that the thought did not cross her mind to leave the residence. Lanore provided additional conflicting testimony regarding speaking to Thurlee, testifying that she asked to speak with him during the interview but was refused the opportunity. This conflict further detracts from her

credibility. Finally, Lanore provided conflicting testimony—both internally conflicting and conflicting with the testimony of Ingram and Petricka—regarding requesting an attorney. When pressed on cross-examination, Lanore provided confusing explanations as to her relationship with Crawford. Given the inconsistencies in Lanore's testimony, with additional support from observations of her demeanor on the witness stand, the Court does not find that Lanore requested to speak with an attorney during the interview with Ingram and Petricka. To the contrary, the Court finds that Lanore voluntarily agreed to speak with Ingram and Petricka.

The second *Griffin* factor is more difficult. During the interview, Lanore did not have complete, unrestrained freedom of movement during questioning. This was not a result of the questioning itself, however, but a by-product of the ongoing search warrant. "Any warrant search is inherently police dominated; there is nothing untoward about that circumstance." *Perrin*, 659 F.3d at 721; *United States v. Williams*, 760 F.3d 811, 815 (8th Cir. 2014). In an effort to prevent distractions from and interference with the execution of the search warrant, Ingram and Petricka questioned Lanore in the three-seasons porch at the rear of the residence. Lanore was permitted to use the restroom when she asked, but given the ongoing search warrant, she was escorted to the restroom by Ingram. Lanore was, however, allowed to enter unattended and unsupervised, showing some freedom of movement that would trend away from custody. Lanore was never handcuffed, restrained, or physically handled by law enforcement at any point. The execution of the search warrant, more than the interview itself, controlled Lanore's movement. The Court finds that while the second *Griffin* factor is partially present, the totality of the circumstances

provides little to no support that such partial existence of the second factor indicates Lanore was in custody or under arrest.

The third *Griffin* factor is partially present. While it is undisputed that law enforcement, not Lanore, initiated contact in this instance, Lanore voluntarily acquiesced to questioning. *See Czichray*, 378 F.3d at 829 ("Against a backdrop of repeated advice that he was free to terminate the interview, [defendant's] decision not to terminate the interview and to allow the interview to proceed to its closing suggests an exercise of free will, rather than restraint to a degree associated with formal arrest. This is not a case where a suspect sought to exercise his option of terminating the interview, only to meet resistance from his interrogators."). Law enforcement entered Lanore's home in the morning, while Lanore was still wearing her bath robe. When asked if she would speak to Ingram and Petricka, Lanore agreed. Lanore was permitted to change out of the bath robe before beginning the interview. Moreover, while not read her *Miranda* rights, Lanore was familiar with said rights at the time of the interview. While Lanore testified that she felt she was not free to conclude the interview or leave the residence, she never verbalized her subjective feelings to law enforcement. Finally, the Court does not find her testimony on this point credible.

The fourth *Griffin* factor, the first of the coercive factors, is absent. The Court sees no strong arm tactics or deceptive stratagems in the actions of law enforcement relating to the interview of Lanore. Law enforcement entered the residence and swept it for officer safety. The residence was secured, and Lanore's interview began shortly thereafter. While law enforcement made a show of force in sending approximately one dozen

federal agents into the residence, only two agents interviewed Lanore. Lanore was allowed to change out of her bath robe before commencing the interview. Lanore was permitted a restroom break sometime during her three-hour long interview. Lanore had water to drink during the interview. The interview took place on a couch, with Petricka sitting on the couch and Ingram sitting across the room on an ottoman. Ingram and Petricka conducted the interview in a casual manner. Ingram and Petricka did not use profanity or shout. Ingram and Petricka's firearms were holstered and hidden from view. Ingram and Petricka were wearing business attire after changing out of their bulletproof vests.

The fifth *Griffin* factor is partially present because the atmosphere of the questioning was police dominated. Ingram, Petricka, and the other law enforcement conducting the search were in control of the situation. Approximately one dozen members of law enforcement were either in the residence conducting a search or performing some other related role, such as interviewing Thurlee. "Any warrant search is inherently police dominated; there is nothing untoward about that circumstance." *Perrin*, 659 F.3d at 721. Police dominance is further diminished because Lanore was in a three-seasons porch at the rear of her home in suburban Edina, away from much of the law enforcement activity. As the Eighth Circuit has noted, "[w]hen a person is questioned 'on his own turf,' we have observed repeatedly that the surroundings are 'not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.'" *Czichray*, 378 F.3d at 826 (quoting *United States v. Rorex*, 737 F.2d 753, 756 (8th Cir. 1984) and *United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir. 1985)).

The sixth *Griffin* factor is not present. Lanore was not arrested at the start or at the conclusion of the interview. Indeed, she was never handcuffed, restrained, or physically handled by law enforcement at any point.

In looking at the totality of the circumstances, and using the *Griffin* factors as guidance, the Court concludes that Lanore was not in custody at the time of her interview. While Lanore testified that she felt she was not free to conclude the interview and leave, Lanore never verbalized her subjective feelings to law enforcement to afford them any opportunity to address or act on her concerns. The Court must look at the objective circumstances and not the subjective view of the participants. *Muhlenbruch*, 634 F.3d at 996 (quoting *Flores-Sandoval*, 474 F.3d at 1146). Moreover, the Court finds Lanore's credibility to be lacking on several important points. Accordingly, the Court finds that a reasonable person in Lanore's position would not consider her freedom of movement restricted to the degree associated with formal arrest. *See United States v. Sutera*, 933 F.2d 641 (8th Cir. 1991) (no custody where law enforcement executed a search warrant, told defendant he was not under arrest and did not have to answer questions, and then interviewed defendant for one hour in his bedroom while the search was ongoing). Therefore, law enforcement was not required to provide Lanore with a *Miranda* warning.

While not dispositive of Lanore's motion, the Court has already considered a similar motion from Lanore's husband and co-defendant, Thurlee, related to the same March 20, 2014 search warrant execution. (ECF No. 56, *adopted by* ECF No. 63). Law enforcement arrived at the Edina residence expecting to interview Thurlee, but he had left

31

to go to the gym. (ECF No. 56, at 7). Law enforcement was able to reach Thurlee to inform him about the search warrant. (ECF No. 56, at 7). Thurlee returned to the Edina residence, then agreed to be interviewed in a home office. (ECF No. 56, at 7). Thurlee was informed he did not have to answer questions and he could end the interview at any time. (ECF No. 56, at 7–8). The Court found Thurlee was not interviewed in a custodial setting and that Thurlee consented to the interview. (ECF No. 56, at 12–13). It would be difficult to conclude a different result in this case, particularly with similar facts surrounding the interview in the Edina residence. In short, the Court recommends Lanore's motion to suppress be denied.

## IV.    RECOMMENDATION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Lanore Belfrey's Motion for Severance, (ECF No. 180), be **DENIED WITHOUT PREJUDICE**;

2. Defendant Thurlee Belfrey's Motion to Dismiss Count 1, (ECF No. 166), and Defendant Roylee Belfrey's Motion to Dismiss Count 1, (ECF No. 181), be **DENIED**;

3. Defendant Lanore Belfrey's Motion to Dismiss Counts 1 and 2 of the Fourth Superseding Indictment Pursuant to Fed. R. Crim. P. 12(b)(3)(B)(iii) and (v), (ECF No. 178), be **DENIED**; and

4.  Defendant Lanore Belfrey's Motion to Suppress Statements, Admissions and

Answers, (ECF No. 173), be **DENIED**.

Date: July 2, 2017                                      _s/ Tony N. Leung_
                                                        Tony N. Leung
                                                        United States Magistrate Judge
                                                        District of Minnesota

                                                        _United States v. Belfrey et al._
                                                        Case No. 14-cr-373 (ADM/TNL)

## <u>NOTICE</u>

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.